Opinion issued December 2, 2021.



In The

# Court of Appeals

For The

## First District of Texas

———————————————

### NO. 01-19-00982-CR

———————————————

**RAYMOND GENE LAZARINE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 184th District Court**
**Harris County, Texas**
**Trial Court Case No. 1411997**

## MEMORANDUM OPINION

A jury found appellant Raymond Gene Lazarine guilty of murder and assessed his punishment at seventy-five years' confinement and a $10,000 fine. In four issues, Lazarine argues (1) Texas Government Code Section 74.056(a) is unconstitutional as applied in his case, (2) the jury charge improperly allowed for a

non-unanimous verdict because it did not require the jury to agree on the statutory definition of murder it believed Lazarine committed, (3) the trial court abused its discretion by denying his motion for mistrial after the prosecutor called him a "monster" during her opening statement, and (4) the trial court erred by failing to inquire as to his ability to pay a fine and court costs before assessing a fine and court costs against him.

We affirm the trial court's judgment.

**Background**

At approximately 11:30 a.m. on December 18, 2013, Raymond Gene Lazarine ("Lazarine") shot his wife Deborah Lazarine ("Deborah") six times, including twice in the face. Lazarine then called the couple's adult son, Nathan, and confessed to shooting Deborah. Nathan immediately drove to his parents' home where he found his mother lying dead on the living room floor. Lazarine was arrested right after. When he saw his father at the police station later that day, Nathan told Lazarine that "he was a monster and he was going to hell." Officer M. Holbrook with the Houston Police Department testified that when she escorted Lazarine to the interview room at the police station, Lazarine told her, "[T]hat's my son right there, I killed his mother, he's right, I'm a monster, and it's all a dream."

At trial, Lazarine's son, Nathan, testified his father was an alcoholic who would go to the liquor store down the street every morning at 10 a.m. According to

2

Nathan, Lazarine would get "intoxicated, take whatever kind of pills he could or whatever he had. And by 12:00, he was very much intoxicated and then usually just passed out by 2:00 or 3:00 every day." Nathan also testified Lazarine had been verbally abusive towards Deborah for most of their marriage. He testified his mother moved to his house for three months in 2012 because she felt unsafe living with Lazarine. Nathan testified that Lazarine would call his home and leave "voicemails . . . saying he was going to kill [Deborah]. You know, he had guns around the house all the time and would say that."

Nathan's sisters, Krysta and Casey, echoed similar sentiments about their father's addiction and abusive nature.[1] Besides being verbally abusive towards Deborah, Krysta testified that when she was in high school, she saw Lazarine holding a gun to her mother's head, and Casey testified that she saw Lazarine punching her mother in the head on a separate occasion. Casey testified Lazarine threatened to kill Deborah if she tried to divorce him, and Krysta testified Lazarine regularly threatened to shoot Deborah. All three children testified that Lazarine was controlling and manipulative towards their mother.

Lazarine did not deny shooting and killing Deborah. Rather, his defense at trial was that he shot Deborah while he was asleep. Lazarine's expert, Jerald Simmons ("Simmons"), testified that he diagnosed Lazarine with REM Behavior

---

[1] All three siblings were in their 30s and 40s at the time of trial.

3

Disorder, a sleep disorder where a person physically acts out his dreams, and Parasomnia Overlap Disorder, which he described as a combination of sleepwalking and REM Behavior Disorder. Simmons opined that Lazarine's behavior the day of the shooting was consistent with his diagnoses, and he testified that it is "possible" for someone with Lazarine's disorders to pick up a gun, walk to another room, and then "shoot somebody six times" without waking. Lazarine's other expert, Victor Scarano ("Scarano"), opined that Lazarine was asleep when he shot Deborah and thus he could not have intended to shoot and kill her. The State's expert, Mark Pressman ("Pressman"), disagreed with Simmons and Scarano and testified that Lazarine's behavior was inconsistent with either REM Behavior Disorder or sleepwalking and that neither condition could account for Lazarine's alleged behavior—getting out of bed, retrieving a gun, walking down the hall into the living room, and shooting Deborah six times, while remaining asleep.

The indictment against Lazarine alleged the offense of murder in the conjunctive under Texas Penal Code Sections 19.02(b)(1) and (2). The indictment alleged Lazarine "intentionally or knowingly cause[d] the death of Deborah Lazarine . . . by shooting [Deborah] with a deadly weapon, namely a firearm" and "unlawfully intend[ed] to cause serious bodily injury to [Deborah] . . . and did cause [Deborah's death] by intentionally and knowingly committing an act clearly dangerous to human life, namely by shooting [Deborah] with a deadly weapon, namely a firearm."

4

Presenting a general verdict form, the trial court gave the following charge to the jury at the close of the guilt-innocence phase.

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 18th day of December, 2013, in Harris County, Texas, the defendant, Raymond Gene Lazarine, did then and there unlawfully, intentionally or knowingly cause the death of Deborah Lazarine, by shooting Deborah Lazarine with a deadly weapon, namely, a firearm; or

> If you find from the evidence beyond a reasonable doubt that on or about the 18th day of December, 2013, in Harris County, Texas, the defendant, Raymond Gene Lazarine, did then and there unlawfully intend to cause serious bodily injury to Deborah Lazarine, and did cause the death of Deborah Lazarine by intentionally or knowingly committing an act clearly dangerous to human life, namely, by shooting Deborah Lazarine with a deadly weapon, namely, a firearm, then you will find the defendant guilty of murder, as charged in the indictment.

The jury returned a guilty verdict, finding Lazarine "guilty of murder as changed in the indictment" and assessed his punishment at seventy-five years' confinement and a $10,000 fine.

## Texas Government Code Section 74.056

Lazarine's case was tried before the 184th District Court of Harris County. At the time of trial, Judge Abigail Anastasio was the elected judge of the 184th District Court. She did not preside over the trial, however. Judge Belinda Hill, who had been assigned to serve as visiting judge, presided over the trial instead. In his first issue, Lazarine argues that Texas Government Code Section 74.056(a), which authorizes a presiding judge to assign visiting judges to try cases and dispose of

5

accumulated business, is unconstitutional as applied in his case, because it violates Article V, Section 7 of the Texas Constitution.

## A.     Standard of Review

The constitutionality of a statute is a question of law we review de novo. *Ex parte Lo*, 424 S.W.3d 10, 14 (Tex. Crim. App. 2013); *Smith v. State*, No. 01-19-00442-CR, 2020 WL 6731656, at *4 (Tex. App.—Houston [1st Dist.] Nov. 17, 2020, pet. ref'd) (mem. op.).   A litigant who raises an "as applied" challenge to the constitutionality of a statute concedes the statute's general constitutionality and instead "asserts that the statute is unconstitutional as applied to his particular facts and circumstances." *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 910 (Tex. Crim. App. 2011); *Smith*, 2020 WL 6731656, at *4.  We presume the statute is valid, and that the Legislature has not acted unreasonably or arbitrarily. *See Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002); *Smith*, 2020 WL 6731656, at *4.  The individual challenging the statute has the burden to prove its unconstitutionality. *Rodriguez*, 93 S.W.3d at 69; *see Schlittler v. State*, 488 S.W.3d 306, 313 (Tex. Crim. App. 2016).

## B.     Analysis

Judge Susan Brown, the presiding judge of the Eleventh Administrative Judicial Region, appointed Judge Belinda Hill "to the Criminal District Courts of Harris County, Texas. . . for the primary purpose of hearing cases and disposing of

any accumulated business requested by the court . . . [p]ursuant to Section 74.056, Texas Government Code."[2]  Judge Hill previously served as the judge of the 230th District Court of Harris County from 1997 until December 2012.

Government Code Section 74.056(a) states:

> A presiding judge from time to time shall assign the judges of the administrative region to hold special or regular terms of court in any county of the administrative region to try cases and dispose of accumulated business.

TEX. GOV'T CODE § 74.056.  Lazarine does not dispute that Judge Brown's order of assignment complies with this section.  Rather, he contends the order violates Article V, Section 7 of the Texas Constitution, which sets out the requirements for judicial districts and district court judges.  Article V, Section 7 of the Texas Constitution states

> The State shall be divided into judicial districts, with each district having one or more Judges as may be provided by law or by this Constitution. Each district judge shall be elected by the qualified voters at a General Election and shall be a citizen of the United States and of this State, who is licensed to practice law in this State and has been a

---

[2]  The assignment states in pertinent part:

> Pursuant to Section 74.056, Texas Government Code, I hereby assign the Honorable Belinda Hill, Senior District Judge, 230th Judicial District Court, to the Criminal District Courts of Harris County, Texas.  This assignment begins the 28th day of October, 2019 and is for the primary purpose of hearing cases and disposing of any accumulated business requested by the court.  This assignment shall continue as may be necessary for the assigned Judge to dispose of any accumulated business and to complete trial of any case or cases begun during this assignment, and to pass on motions for new trial and all other matters growing out of accumulated business or cases heard before the Judge herein assigned, or until terminated by the Presiding Judge.

7

practicing lawyer or a Judge of a Court in this State, or both combined, for four (4) years next preceding his election, who has resided in the district in which he was elected for two (2) years next preceding his election, and who shall reside in his district during his term of office and hold his office for the period of four (4) years, and who shall receive for his services an annual salary to be fixed by the Legislature. The Court shall conduct its proceedings at the county seat of the county in which the case is pending, except as otherwise provided by law. He shall hold the regular terms of his Court at the County Seat of each County in his district in such manner as may be prescribed by law. The Legislature shall have power by General or Special Laws to make such provisions concerning the terms or sessions of each Court as it may deem necessary.

The Legislature shall also provide for the holding of District Court when the Judge thereof is absent, or is from any cause disabled or disqualified from presiding.

TEX. CONST. art. V, § 7. Focusing on the last sentence, Lazarine argues Article V, Section 7 "creates an absolute prohibition on the assignment of visiting judges outside of situations in which the elected district judge is absent, disabled, or disqualified." He thus contends that as applied to him, Government Code Section 74.056(a) violates Article V, Section 7 because it permitted Judge Hill to preside over his trial, even though nothing in the record suggested Judge Abigail Anastasio, the elected judge of the 184th District Court, was absent, disabled, or disqualified at the time of his trial.

This Court recently rejected this same argument under very similar circumstances in *Smith v. State*, No. 01-19-00442-CR, 2020 WL 6731656, at *4

8

(Tex. App.—Houston [1st Dist.] Nov. 17, 2020, pet. ref'd) (mem. op.).[3]  In *Smith*, a visiting judge previously assigned to a district court under Government Code Section 74.056(a) presided over Smith's case.   Like Lazarine, Smith argued Section 74.056(a) was unconstitutional because the statute, as applied, permitted the visiting judge to preside over his case, even though there was no evidence the elected judge of the district court was unable to preside over Smith's case due to her absence, disability, or disqualification.   *Smith*, 2020 WL 6731656, at *5.   After analyzing Article V, Section 7 and its interpretive commentary explaining the purpose of the constitutional provision, we held that

> Both the plain language of [Article V, Section 7's] text and its apparent purpose indicate that the provision was intended to ensure that when a district judge is absent, disabled, or disqualified, court can be held without significant delay or interruption.  Nothing in the provision's text, or otherwise, indicates that the legislature lacks authority to enact legislation permitting eligible and qualified judges to be assigned to district courts even when the elected judge of the district court is not absent, disabled, or disqualified.

*Smith*, 2020 WL 6731656, at *6 (citing *Dean v. Dean*, 214 S.W. 505, 507 (Tex. Civ. App.—1919, no writ)); *see also Wiggins v. State*, 622 S.W.3d 556, 560 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd) (following *Smith*'s reasoning and holding Wiggins had not met his burden to show that Government Code Section 74.056(a)

---

[3]     We issued our opinion in *Smith v. State*, No. 01-19-00442-CR, 2020 WL 6731656 (Tex. App.—Houston [1st Dist.] Nov. 17, 2020, pet. ref'd) (mem. op.) after the parties filed their briefs in this appeal.

9

was unconstitutional as applied). Based on our interpretation of Article V, Section 7, we held Smith had not met his burden to show that Government Code Section 74.056(a) was unconstitutional as applied.

The same is true here. Pursuant to *Smith*, we hold Lazarine has not met his burden to show that Government Code Section 74.056(a) is unconstitutional as applied to him.

We overrule Lazarine's first issue.

**Jury Unanimity**

In his second issue, Lazarine argues the trial court erred by submitting a jury charge that alleged two separate statutory offenses of murder under Penal Code Section 19.02(b)(1) and (2). He argues the jury charge, as submitted, allowed the jury to return a non-unanimous verdict of guilty because it did not require the jury to agree on the statutory definition of murder it believed Lazarine committed.

**A.     Standard of Review and Applicable Law**

Article V, Section 13 of the Texas Constitution and Texas law requires jury verdicts to be unanimous in felony cases. TEX. CONST. art. V, § 13; *see O'Brien v. State*, 544 S.W.3d 376, 382 (Tex. Crim. App. 2018); *Young v. State*, 341 S.W.3d 417, 422 (Tex. Crim. App. 2011). The jury "must agree that the defendant committed one specific crime, but this does not mean that the jury must unanimously find that the defendant committed that crime in one specific way or even with one

10

specific act." *O'Brien*, 544 S.W.3d at 382; *see also Young*, 341 S.W.3d at 422 (holding jury must agree about occurrence of single criminal offense but need not be unanimous about specific manner and means of how offense was committed). Although a jury must agree unanimously on each essential element of a crime to convict, "the requirement of jury unanimity is not violated by a jury charge that presents the jury with the option of choosing among various alternative manner and means of committing the same statutorily defined offense." *O'Brien*, 544 S.W.3d at 382. When alternate theories of committing the same offense are submitted to the jury in the disjunctive, it is appropriate for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the submitted theories. *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) (en banc); *Aguirre v. State*, 732 S.W.2d 320, 326 (Tex. Crim. App. 1987).

In analyzing a jury unanimity challenge, appellate courts examine the statute defining the offense to determine whether the Legislature created "multiple, separate offenses, or a single offense" with multiple or alternate methods or means of commission. *Pizzo v. State*, 235 S.W.3d 711, 714 (Tex. Crim. App. 2007); *see also O'Brien*, 544 S.W.3d at 384 (holding the inquiry "is primarily a question of legislative intent"). We conduct a statutory analysis "that seeks to ascertain the focus or gravamen of the offense." *Id.* at 383. To summarize

> If the gravamen of the crime is the "result of the conduct," the jury must
> be unanimous about the specific result required by the statute but not

11

the specific conduct. If the gravamen of the crime is the "nature of the conduct," the jury must be unanimous about the specific criminal act committed. And if the gravamen of the crime is a "circumstances surrounding the conduct," unanimity is required about the existence of the particular circumstance of the offense.

*Id.*[4]

Lazarine was convicted of murder, a result-oriented offense. *See Young*, 341 S.W.3d at 423 (stating "murder is a 'result of conduct' offense"). The Texas Penal Code provision relevant to our analysis is Section 19.02(b). It provides that:

(b) A person commits [murder] if he:

    (1)  intentionally or knowingly causes the death of an individual;

    (2)  intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

    (3)  commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an

---

[4]    The Texas Court of Criminal Appeals has explained the three general categories of criminal offenses:

> First, "result of conduct" offenses concern the product of certain conduct. For example, murder is a "result of conduct" offense because it punishes the intentional killing of another regardless of the specific manner . . . of causing the person's death. . . With the second category, "nature of conduct" offenses, it is the act or conduct that is punished, regardless of any result that might occur. . . Finally, "circumstances of conduct" offenses prohibit otherwise innocent behavior that becomes criminal only under specific circumstances.

*Young v. State*, 341 S.W.3d 417, 423 (Tex. Crim. App. 2011).

act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE § 19.02(b). To convict a defendant for a result-oriented offense like murder, the jury must be unanimous about (1) the defendant (2) causing the proscribed result (3) against the complainant (4) on a specific occasion. *See Jefferson v. State*, 189 S.W.3d 305, 315–16 (Tex. Crim. App. 2006) (Cochran, J., concurring).

The indictment against Lazarine alleged the offense of murder in the conjunctive under Sections 19.02(b)(1) and (2) of the Texas Penal Code. The indictment alleged that "on or about December 18, 2013" Lazarine "unlawfully, intentionally and knowingly cause[d] the death of Deborah Lazarine . . . by shooting [Deborah] with a deadly weapon, namely a firearm" and "further" that "on or about December 18, 2013" Lazarine "unlawfully intend[ed] to cause serious bodily injury to Deborah Lazarine . . . and did cause the death of [Deborah] by intentionally and knowingly committing an act clearly dangerous to human life, namely by shooting [Deborah] with a deadly weapon, namely a firearm."

Although the indictment alleged the offense of murder in the conjunctive, the trial court instructed the jury in the disjunctive. Presenting a general verdict form, the trial court gave the following charge to the jury at the close of the guilt-innocence phase:

The defendant, Raymond Gene Lazarine, stands charged by indictment with the offense of murder, alleged to have been committed on or about the 18th day of December, 2013, in Harris County, Texas.
. . .

Now, if you find from the evidence beyond a reasonable doubt that on or about the 18th day of December, 2013, in Harris County, Texas, the defendant, Raymond Gene Lazarine, did then and there unlawfully, intentionally or knowingly cause the death of Debrah Lazarine, by shooting Debrah Lazarine with a deadly weapon, namely, a firearm; or

If you find from the evidence beyond a reasonable doubt that on or about the 18th day of December, 2013, in Harris County, Texas, the defendant, Raymond Gene Lazarine, did then and there unlawfully intend to cause serious bodily injury to Debrah Lazarine, and did cause the death of Debrah Lazarine by intentionally or knowingly committing an act clearly dangerous to human life, namely, by shooting Debrah Lazarine with a deadly weapon, namely, a firearm, then you will find the defendant guilty of murder, as charged in the indictment.

The jury returned a guilty verdict, finding Lazarine "guilty of murder, as charged in the indictment."

## B.    Analysis

The question presented by Lazarine is whether the jury charge merely charged alternate theories of committing the same offense or whether the jury charge included two separate offenses charged in the disjunctive.  Based on the "grammar test" espoused by Judge Cochran in her concurring opinion in *Jefferson v. State*, 189 S.W.3d 305, 315–16 (Tex. Crim. App. 2006) (Cochran, J., concurring), Lazarine argues Section 19.02(b)(1) and (2) of the Texas Penal Code are "two separate offenses" and thus instructing the jury to return a guilty verdict "if it found [he]

14

committed either of two separate criminal offenses" violated his constitutional guarantee of jury unanimity. We disagree.

This Court's opinion in *Braughton v. State*, 522 S.W.3d 714 (Tex. App.—Houston [1st Dist.] 2017), *aff'd*, 569 S.W.3d 592 (Tex. Crim. App. 2018) is instructive. In that case, Braughton argued the evidence was legally insufficient to support his murder conviction because there was no evidence establishing he possessed the required mental state to commit murder. *Braughton*, 522 S.W.3d at 727. In analyzing the issue, this Court stated:

> A person has the requisite mens rea for the offense of murder when he "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE § 19.02(b)(1)–(2). A person acts "intentionally" with respect to the nature or result of his conduct "when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). A person acts "knowingly" "with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). When, as in this case, the charge presents two legal theories of murder—knowingly causing death or intending to cause serious bodily injury and committing an act clearly dangerous to human life that causes death—the theories are alternative manners and means of committing the offense of murder, rather than distinct offenses. *See Aguirre v. State*, 732 S.W.2d 320, 326 (Tex. Crim. App. 1982) (en banc) (op. on rehearing).

*Id.* at 727–28.

Lazarine argues *Braughton* is not binding because the defendant never argued his conviction was improper based on a lack of jury unanimity and therefore, our statement that Section 19.02(b)(1) and (2) are theories of "alternative manners and

means of committing the offense of murder, rather than distinct offenses" is dicta. He further argues this Court did not use Judge Cochran's eighth-grade grammar test to determine whether murder under Section 19.02(b)(1) and (2) are the same offense, but instead relied on the Court of Criminal Appeals' opinion in *Aguirre v. State*, 732 S.W.2d 320, 326 (Tex. Crim. App. 1982) (en banc) for this proposition. In *Aguirre*, the Court held that an indictment alleging theories of both intentional and knowing murder and felony murder did not allege different offenses, but only different ways of committing the same offense. *Id.* Lazarine contends that the *Braughton* Court's reliance on *Aguirre* was misplaced because *Aguirre* was issued almost thirty years before *Braughton* and well before Judge Cochran first articulated her eighth-grade grammar test in *Jefferson*. Lazarine's arguments are unpersuasive.

Even if the language in *Braughton* is dicta*, Aguirre* is binding precedent from the Court of Criminal Appeals. And while *Aguirre* addressed the former versions of Section 19.02(b)(1) and (3),[5] this Court and others have cited routinely to *Aguirre* for the proposition that Section 19.02(b)(1), (2) and (3), in their current form, set forth alternative theories of murder and not, as Lazarine contends, distinct offenses. *See Gilbert v. State*, 575 S.W.3d 848, 860 (Tex. App.—Texarkana 2019, pet. ref'd) (involving Section 19.02(b)(1), (2) and (3)); *Smith v. State*, 436 S.W.3d 353, 378 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (involving Section 19.02(b)(1),

---

[5]    Section 19.02(b)(3) is commonly referred to as felony murder.

16

(2) and (3)); *Bundy v. State*, 280 S.W.3d 425, 433 (Tex. App.—Fort Worth 2009, pet. ref'd) (involving Section 19.02(b)(1), (2)); *Barfield v. State*, 202 S.W.3d 912, 916 (Tex. App.—Texarkana 2006, pet. ref'd) (involving Section 19.02(b)(1) and (3)).

We are not persuaded that *Aguirre* is of *"little precedential value,"* as Lazarine argues. Although Section 19.02 was modified in 1994, the relevant portions of the statute—what are now Section 19.02(b)(1) and (2)—remain unchanged. That Judge Cochran's eighth-grade grammar approach in *Jefferson* was first articulated after *Aguirre* is also of little consequence because even before *Jefferson*, Texas courts had long interpreted statutes by first looking to the plain language of the statute. *See Boykin v. State*, 818 S.W.2d 782, 785–86 (Tex. Crim. App. 1991) (en banc) (stating courts focus on "the literal text of statute" when "attempting to discern this collective legislative intent or purpose," and noting that "[t]his method of statutory interpretation is of ancient origin"). Judge Cochran's eighth-grade grammar approach is thus not a new test that must be used to determine the Legislature's intent; it is a "rule of thumb" that courts may use when analyzing the plain language of a statute. *See Jones v. State*, 323 S.W.3d 885, 890 (Tex. Crim. App. 2010) ("One aspect of grammar is the 'eighth grade grammar' approach suggested by Judge Cochran as 'a general rule of thumb' for determining legislative intent."); *Stuhler v. State*, 218 S.W.3d 706, 718 (Tex. Crim. App. 2007) (stating Judge Cochran's "eighth

17

grade grammar" approach is "a general rule of thumb for making this determination of legislative intent"). We further note that the Court of Criminal Appeals has warned against "uncritical[ly]" applying the "grammar test," cautioning that while the test is "generally useful" and a good "rule of thumb," it "will not necessarily work invariably, in every scenario, to accurately identify legislative intent." *Leza v. State*, 351 S.W.3d 344, 357 (Tex. Crim. App. 2011).

Lazarine argues we must nonetheless analyze Section 19.02(b) using Judge Cochran's "eighth-grade grammar" test, which, according to Lazarine, establishes that Section 19.02(b)(1) and (2) are separate offenses. We disagree. First, courts have interpreted Section 19.02(b) as setting forth alternative theories of murder, as opposed to three distinct offenses for decades. *Aguirre*, 732 S.W.2d at 326. And contrary to Lazarine's contention that the issue before us is one of first impression, courts have continued to do so even when presented with the same unanimity challenge Lazarine raises. *See London v. State*, 325 S.W.3d 197, 206–07 (Tex. App.—Dallas 2008, pet. ref'd) (holding sections 19.02(b)(1) and 19.02(b)(2) did not constitute two separate statutory offenses of murder and jury charge that allowed jury to find defendant guilty of murder without agreeing as to which section was satisfied did not violate defendant's right to a unanimous verdict); *Diko v. State*, 488 S.W.3d 855, 858 (Tex. App.—Fort Worth 2016, pet. ref'd) ("This court, on three previous occasions, has rejected the argument . . . that sections 19.02(b)(1) and

19.02(b)(2) constitute two separate offenses and that a trial court violates the unanimity requirement by allowing the jury to find a defendant guilty without requiring the jury to agree on which offense the defendant committed."); *Smith*, 436 S.W.3d at 378 ("Both the indictment and the jury charge indicate that the only offense involved in this case was murder by any of the three methods set forth in the Penal Code . . . . The jury was not required to agree unanimously as to the manner and means by which appellant did so."); *Garcia v. State*, 246 S.W.3d 121, 141 (Tex. App.—San Antonio 2007, pet ref'd) ("[W]hether the jury determined that Garcia caused the death of Lesa Garcia [under Section 19.02(b)(1) or 19.02(b)(2)] there was only one single crime of murder."). This principle is so well established that we see no need to engage in any further analysis.[6]

Even if we were to employ the "eighth-grade grammar" approach to determine whether the Legislature created multiple, separate offenses, or a single offense with different methods or means of commission when it drafted Section 19.02(b), we

---

[6] We further note that when interpreting a statute, we must also "consider any prior judicial construction of the statute." *Jones v. State*, 323 S.W.3d 885, 888 (Tex. Crim. App. 2010). This is especially important when that construction is longstanding because the Legislature could have changed the statute if it did not agree with prior judicial interpretation, and "the interests of *stare decisis* are at their height for judicial constructions of legislative enactments upon which the parties rely for guidance in conforming to those enactments." *Id.* at 889. Section 19.02 has been amended only once since 1974, and while the 1994 amendment modified the language of the felony murder provision, it did not alter the language of what are now Sections 19.02(b)(1) and (2).

would reach the same conclusion. Judge Cochran's eighth-grade grammar approach is best summarized as follows:

> In sum, we must return to eighth-grade grammar to determine what elements the jury must unanimously find beyond a reasonable doubt. At a minimum, these are: the subject (the defendant); the main verb; and the direct object if the main verb requires a direct object (i.e., the offense is a result-oriented crime); and the specific occasion (the date phrase within the indictment, but narrowed down to one specific incident regardless of the date alleged). Generally, adverbial phrases, introduced by the preposition "by," describe the manner and means of committing the offense. They are not the gravamen of the offense, nor elements on which the jury must be unanimous.

*Jefferson*, 189 S.W.3d at 315–16 (Cochran, J., concurring).

Employing Judge Cochran's grammar test, Lazarine argues that the "prohibited conduct" under Section 19.02(b)(2) is causing "serious bodily harm," while the "prohibited conduct" under Section 19.02(b)(1) is "causes the death of an individual." Section 19.02(b)(2) states that a person commits murder if he "intends to cause serious bodily injury and commits an act clearly dangerous to human life *that causes the death of an individual*." TEX. PENAL CODE § 19.02(b)(2) (emphasis added). Lazarine evaluates only the first part of Section 19.02(b)(2), ignoring the second which identifies the gravamen of the offense: "death of an individual." Were we to adopt Lazarine's interpretation, we would in effect be removing "death of an individual" from Section 19.02(b)(2), rendering that language superfluous or relegating the gravamen of the offense to the manner and means of committing the offense. We decline to do so.

20

Section 19.02(b) provides that a person commits murder if he:

(1) intentionally or knowingly ***causes the death of an individual***;

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that ***causes the death of an individual***; or

(3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that ***causes the death of an individual***.

TEX. PENAL CODE § 19.02(b) (emphasis added). Under Judge Cochran's "grammar test," the subject in Section 19.02(b)(2) is the defendant, the main verb is "causes" and the direct object of the main verb is "the death of an individual." Thus, the gravamen of the crime is the "result of the conduct," which is the same under Section 19.02(b)(1) and (2): the death of an individual.

We hold consistent with our prior decision in *Braughton,* that when, as here, a "charge presents two legal theories of murder—[intentionally or] knowingly causing death or intending to cause serious bodily injury and [intentionally or knowingly] committing an act clearly dangerous to human life that causes death— the theories are alternative manners and means of committing the offense of murder, rather than distinct offenses." *Braughton*, 522 S.W.3d at 727–28; *see also Johnson v. State*, 364 S.W.3d 292, 298 (Tex. Crim. App. 2012) (citing all three definitions of statutory manners of murder and stating: "the focus or gravamen of the offense is

21

that the victim was killed"); *Fraser v. State*, 593 S.W.3d 883, 890 (Tex. App.—Amarillo 2019, pet. ref'd) (stating gravamen of offense of murder under all three subparts of section 19.02(b) "is causing the death of an individual").  Unanimity is generally not required on the alternate manner and means of committing an offense. *See Kitchens*, 823 S.W.2d at 258 ; *Aguirre*, 732 S.W.2d at 326.  Thus, the trial court did not err in charging the jury.

We overrule Lazarine's second issue.

### Mistrial

During her opening statement, the prosecutor referred to Lazarine as a "monster."  Lazarine objected and the trial court sustained the objection instructing the jury to disregard the prosecutor's statement.  Lazarine then moved for a mistrial, which the trial court denied.  In his third issue, Lazarine argues the trial court abused its discretion by denying his motion for a mistrial.

### A.    Standard of Review and Applicable Law

When, as here, the trial court instructs the jury to disregard improper argument, the proper analysis is whether the trial court abused its discretion in denying the defendant's motion for mistrial.  *Archie v. State*, 340 S.W.3d 734, 738–39 (Tex. Crim. App. 2011) ("Because the trial court sustained the appellant's objection and instructed the jury to disregard the argument, '[t]he only adverse ruling—and thus the only occasion for making a mistake—was the trial court's

22

denial of the motion for mistrial.' Thus, 'the proper issue is whether the refusal to grant the mistrial was an abuse of discretion.'") (quoting *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004)). Under this standard, we view the evidence in the light most favorable to the trial court's ruling and uphold the ruling if it falls within the zone of reasonable disagreement. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009); *Griffin v. State*, 571 S.W.3d 404, 416 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd).

A mistrial is a device used to halt trial proceedings when error is so prejudicial that the expenditure of further time and expense would be wasteful and futile. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). It is "an extreme remedy and should be exceedingly uncommon." *Williams v. State*, 417 S.W.3d 162, 175 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (citing *Hawkins*, 135 S.W.3d at 77 (stating mistrial is required only "in extreme circumstances, where the prejudice is incurable")); *see also Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000) ("Mistrial is a remedy appropriate for a narrow class of highly prejudicial and incurable errors[.]"). Granting a motion for mistrial is appropriate only when "the objectionable events are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant." *Archie*, 340 S.W.3d at 739 (quoting *Young v. State*, 137 S.W.3d 65, 71 (Tex. Crim. App. 2004) (en banc)).

23

When constitutional rights are not implicated,[7] we evaluate whether a trial court abused its discretion in denying a mistrial based on improper jury argument by weighing the factors set forth in *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998). We consider "(1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge), and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction)."[8] *Id.*; *see also Archie*, 340 S.W.3d at 739. When an instruction to disregard is sufficient to cure the harm, the trial court does not err by denying a motion for mistrial. *Young*, 137 S.W.3d at 72; *Griffin*, 571 S.W.3d at 416–17.

**B.     Analysis**

At the end of her opening statement, the prosecutor told the jury, "Sometimes when you are a kid, you hear about monsters under the bed. In this case, it was the

---

[7]     Generally, error involving improper jury argument is non-constitutional. *See Martinez v. State*, 17 S.W.3d 677, 692 (Tex. Crim. App. 2000); *Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011).

[8]     Although the relevant question is whether the trial court abused its discretion in denying a motion for mistrial and not whether the decision was harmful, "the question of whether a mistrial should have been granted involves most, if not all, of the same considerations that attend a harm analysis." *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004) (stating court of appeals and parties mischaracterized issue as one of harm because when only adverse ruling was trial court's denial of motion for mistrial, "the proper issue is whether the refusal to grant the mistrial was an abuse of discretion.").

monster that's sitting right there." Lazarine objected to the prosecutor calling him a "monster." The trial court sustained the objection and instructed the jury to disregard the prosecutor's statement. Lazarine then moved for a mistrial and the trial court denied the motion. Lazarine argues the prosecutor's statement was "inherently prejudicial," and the jury could not have been expected to put the statement aside during its evaluation of the evidence because the statement "caused the jury to doubt Mr. Lazarine's defense of acting during his sleep."[9] Applying the *Mosley* factors, we consider whether the trial court abused its discretion by denying Lazarine's motion for mistrial.

The first *Mosley* factor considers "the severity of the misconduct, or in other words, the magnitude of the prejudicial effect of the prosecutor's [misconduct]." *Archie*, 340 S.W.3d at 740. The record reflects that any potential prejudicial effect resulting from the prosecutor's statement was mitigated by similar, unobjected to, testimony elicited later the same day. Lazarine's son, Nathan, testified that when he saw Lazarine at the police station on the day of the murder, he told his father that "he was a monster and he was going to hell." Officer M. Holbrook also testified that when she escorted Lazarine to the interview room at the police station, Lazarine told her, "[T]hat's my son right there, I killed his mother, he's right, I'm a monster, and it's all a dream." There was also testimony from all three of Lazarine's children that

---

[9]     Neither Lazarine nor the State mention the *Mosley* factors in their appellate briefing.

Lazarine was a severe alcoholic who had abused Deborah verbally for decades, threatened to kill her, hit her, and even held a gun to her head. Given this subsequent, unobjected to, testimony, the first *Mosley* factor weighs in favor of the trial court's decision to deny Lazarine's motion for a mistrial.

The second *Mosley* factor considers the measures the trial court adopted to cure the misconduct. In this case, the trial court immediately applied the curative measure requested by Lazarine, the instruction to disregard the prosecutor's statement.[10] Ordinarily, prompt instructions are effective to cure the harm from improper argument and we generally presume that the trial court's instruction will be obeyed by the jury. *Archie*, 340 S.W.3d at 741. Lazarine does not explain, and we cannot discern, why the trial court's instruction to disregard was not effective to cure the alleged error. *Id.* at 739 ("Mistrial is the appropriate remedy when the objectionable events are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant."). This factor also weighs in favor of the trial court's decision to deny Lazarine's motion for a mistrial.

The third *Mosley* factor requires us to consider "the certainty of conviction absent the misconduct." *Id.* at 741. Lazarine does not dispute he shot and killed his wife, Deborah. Rather, Lazarine argued at trial that he was asleep when he shot her

---

[10] The trial court instructed the jury to "disregard the comment of the prosecutor."

and thus his behavior was not voluntarily. Both Lazarine and the State presented competing expert testimony regarding Lazarine's defense. Lazarine's expert, Simmons, testified that Lazarine was suffering from REM Behavior Disorder and Parasomnia Overlap Disorder and that someone with those conditions is capable of walking into another room with a gun and killing a person while remaining asleep. Dr. Scarano, Lazarine's other expert, offered similar testimony. The State's expert, Pressman, however, disagreed with Simmons and Scarano and opined that Lazarine's behavior was inconsistent with both REM Behavior Disorder and sleepwalking. The State's theory, as evidenced by the prosecutor's opening and closing statements, was that Lazarine may have been intoxicated when he shot Deborah, but he concocted his sleeping defense after he realized that voluntary intoxication is not a defense to murder. The State also argued in closing that Lazarine began seeking medical attention for an altered mental state after he was arrested and began sleepwalking in jail, even though his immediate family had never seen Lazarine sleepwalking before. According to Pressman, sleepwalking is most common among children, and it would be very unusual for an adult to start sleepwalking in his 60s, as Lazarine had apparently done.

Lazarine's children, Nathan, Krysta, and Casey, also testified that Lazarine was an alcoholic who was physically, verbally, and emotionally abusive towards their mother during their marriage. Nathan testified that Deborah moved in with him

27

for a few months in 2012 and that Lazarine would call his home and leave voicemails threatening to kill her. Although Nathan never witnessed Lazarine physically abuse Deborah, Krysta saw Lazarine holding a gun to her mother's head and Casey testified she saw Lazarine punch her mother in the head on a separate occasion. Casey and Krysta also testified that Lazarine regularly threatened to kill Deborah.

Based on Pressman's testimony and the children's testimony that Lazarine was an abusive alcoholic who had abused and threatened to kill Deborah, there was sufficient evidence from which the jury could have reasonably rejected Lazarine's defense that he was asleep when he shot and killed Deborah. This factor weighs in favor of the trial court's decision to deny Lazarine's motion for a mistrial.

After weighing the *Mosley* factors, we conclude the prosecutor's reference to Lazarine as a "monster" was an isolated incident that was mitigated by similar testimony from two witnesses. The alleged error was promptly addressed by the trial court, who immediately instructed the jury to disregard the comment, and the evidence of guilt was so strong that there is a reasonable certainty Lazarine would have been convicted absent the misconduct.

Under these circumstances, the trial court was reasonable in believing that its instruction to disregard the comment was effective and that Lazarine was not prejudiced by the prosecutor's remark. *See Hawkins*, 135 S.W.3d at 85. We

28

conclude the trial court did not abuse its discretion by denying Lazarine's motion for mistrial.

We overrule Lazarine's third issue.

## Assessment of Costs and Fines

Texas Code of Criminal Procedure Article 42.15(a-1) states that "during or immediately after imposing a sentence in a case" the trial court "shall inquire whether the defendant has sufficient resources or income to immediately pay all or part of the fine and costs." TEX. CODE CRIM. PROC. art. 42.15(a-1). In his fourth issue, Lazarine argues the trial court erred by assessing a $10,000 fine and $440 in court costs against him without first inquiring about his ability to pay the fine and costs.

The recitals in the judgment of conviction reflect the trial court ordered Lazarine to pay a fine and court costs "[a]fter having conducted an inquiry into [Lazarine's] ability to pay." The trial court signed the judgment the same day it imposed Lazarine's sentence. We presume the regularity of the trial court's judgment and records unless there is affirmative evidence to the contrary. *Jones v. State*, 77 S.W.3d 819, 822 (Tex. Crim. App. 2002); *Breazeale v. State*, 683 S.W.2d 446, 450–51 (Tex. Crim. App. 1985). "Where procedural requirements do not affirmatively appear in the record to have been violated, a presumption of regularity of the trial judge's ruling must prevail." *Smith*, 2020 WL 6731656, at *9 (quoting

*Jones v. State*, 646 S.W.2d 449, 449 (Tex. Crim. App. 1983)).  The burden is on the appellant to overcome this presumption.  *Ex parte Wilson*, 716 S.W.2d 953, 956 (Tex. Crim. App. 1986).

The only evidence Lazarine points to in support of a procedural violation is the fact the trial court did not ask about Lazarine's ability to pay on the record during his sentencing hearing.  But Article 42.15(a-1) does not obligate the trial court to make such an inquiry during the sentencing hearing.  *See* TEX. CODE CRIM. PROC. art. 42.15(a-1).  And a silent reporter's record concerning the trial court's inquiry about a defendant's ability to pay the assessed fine and costs does not contradict a recital in the judgment reflecting the trial court made the inquiry.  *See Smith*, 2020 WL 6731656, at \*9 (citing *Simms v. State*, 848 S.W.2d 754, 756 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd)).

Because there is no affirmative evidence demonstrating a procedural violation, we hold Lazarine did not overcome the presumption of regularity.  *See Smith*, 2020 WL 6731656, at \*9; *see also Breazeale*, 683 S.W.2d at 451 (stating that presumption of judgment's regularity and truthfulness "is never to be lightly set aside").

We overrule Lazarine's fourth issue.

### Conclusion

We affirm the trial court's judgment.

Veronica Rivas-Molloy
Justice

Panel consists of Chief Justice Radack and Justices Rivas-Molloy and Guerra.

Do not publish. TEX. R. APP. P.